NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM SERRANO, | Hon. Dennis M. Cavanaugh |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 12-cv-04865 (DMC) (JAD) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY | |
| Defendant. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon the Appeal of William Serrano ("Plaintiff" or "Serrano") from the final decision of the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claims for a period of disability and disability insurance benefits ("DIBs") under Title II of the Social Security Act (the "Act") and his application for supplemental security income under Title XVI of the Act, and upon two decisions of Administrative Law Judge Curtis Axelsen (the "ALJ") after a First and Second Remand. This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

After reviewing the submissions of both parties, for the following reasons, the final decision entered by the ALJ is **affirmed**.

I. **BACKGROUND**[1]

A. **PROCEDURAL HISTORY**

On May 4, 2007, Serrano filed an application for a period of disability and supplemental security insurance benefits, alleging that he was disabled as of April 30, 2007. The applications were denied initially and upon Reconsideration (Tr. 206-215, 303-304). Serrano requested a hearing before an ALJ to review his application de novo (Id. at 113-117). Hearings were held on October 5, 2009, January 25, 2010, and June 16, 2010 before the ALJ. On July 20, 2010, the ALJ issued a decision denying Serrano's application on the grounds that his residual functional capacity ("RFC") was suited to jobs identified by the vocational expert (the "VE") (Id. at 12-23). Serrano then sought review of the ALJ's decision with the Social Security Appeals Council ("Appeals Council") (Id. at 6-7). On May 30, 2012, the Appeals Council concluded that there were no grounds for review. Plaintiff filed the instant Appeal on August 3, 2012 (ECF No. 1), and a Brief in Support on March 12, 2013 ("Pl.'s Br.," ECF No. 12). The Acting Commissioner of Social Security (the "Commissioner") filed a Brief on May 24, 2013 ("Def.'s Br.," ECF No. 16).

B. **FACTUAL HISTORY**

1. **Testimony of Serrano**

On January 25, 2010, Serrano testified in a hearing before the ALJ that he had been a construction worker but sustained several back injuries that impeded his ability to perform his job duties (Tr. 33-34). Serrano stated that he had been homeless and had been moving from one house to another because he could not afford to pay rent while unemployed (Id. at 34). Serrano complained of emotional distress, and the ALJ scheduled him for a psychiatric exam and

---

[1] The facts set-forth in this Opinion are taken from the Parties' statements in their respective moving papers and the transcript of the record.

informed him that the VE would assess the impact of his claimed impairments on his ability to work (Id. at 35). The ALJ stated he would reschedule the hearing after those two exams (Id).

The hearing was rescheduled for, and was held on, June 10, 2010. Serrano testified that he was a thirty-five year old native of Caracas, Venezuela and became a U.S. citizen in 2000 (Id. at 43). Serrano stated that he could read and write in English and received an eighth grade education in Venezuela before coming to the United States in or around 1989 (Id.). Serrano said that he worked as a construction worker doing mostly "handyman work, like repairing, like small plumbing repair" (Id.). Serrano said that his work required constant walking and he typically lifted and carried plumbing supplies that were approximately fifty pounds (Id.).

Serrano stated that he had been a construction worker for nearly the entirety of his stay in the United States, but had a two year hiatus in 1993-94 while working in a customer service telecommunications position (Id.). Serrano also recalled some sparse work as a valet parker and as a maintenance worker at a hospital (Id. at 46). Serrano stated that he stopped working entirely in April 2007 because he felt a great deal of pain in his back, legs, and feet (Id. at 47-48). He stated that he initially hurt his back when he fell off a rooftop, and that although the pain was manageable initially, after continuing to do the heavy lifting required of him, the pain became worse (Id).

Serrano testified that he went to a doctor in 2007 who administered several epidural shots that did not improve his symptoms (Id. at 50). Serrano stated that he "couldn't feel my legs for a while" and discontinued that treatment (Id). Serrano's health insurance was cancelled once he stopped working and he did not receive any funds from Worker's Compensation to cover the cost of his treatment (Id. at 51). Serrano stated that he filed for Social Security benefits at this time (Id). Serrano maintained that his pain was especially acute when he walked or sat for long

periods of time (Id. at 53). He complained of weakness in his legs, and he fell a few times while walking more than a block or two (Id.). His treating physician at the time, Dr. Arias, recommended he use a cane while walking, and Serrano took this advice (Id.). Serrano began to suffer from depression because he was unable to engage in activities he had done before the injury (Id. at 54). Serrano admitted he had not sought psychological treatment in connection with his depression other than from the Social Security doctor assigned to his case (Id.).

Serrano stated that he could sit no longer than fifteen to twenty minutes at a time and could lift no more than about five pounds before his back pain flared up (Id. at 56). Serrano said his depression kept him indoors nearly all the time and that he got out of the house only two times a month (Id. at 57). He said his apathy towards his former normal activities had started about two years prior to the hearing (Id.). He also stated that the more he did not feel like engaging in his former normal activities, the more depressed he became (Id. at 58). Serrano testified that he had difficulty concentrating and difficulties with his memory (Id. at 60). Serrano stated that he was taking Percocet to alleviate his pain, but stopped taking it when he became sick (Id. at 62). Serrano did not take any medication for his depression (Id.). Serrano described his typical day as physically painful and socially uneventful (Id. at 65). He said that he only got out of bed to eat and occasionally watch television, and that he never had anyone over or went to see any friends (Id.). Serrano said that he had no desire to see or talk to anyone aside from his mother, and preferred his own company most of the time. Occasionally he went to the store, but otherwise he did not leave the house (Id. at 66).

Serrano stated that he stopped going to pain management after complications with epidural shots because he feared becoming paralyzed by them (Id. at 79). He said he received three shots, two of which he recalled the dates on which they were administered: September 9th

and 22nd of 2007 (Id.). He maintained that even though the record his attorney had did not reflect a third shot, that one was administered "[e]ither two weeks after the last one, or two weeks before the first one" (Id.). Serrano later testified that he had attended high school in New Jersey and completed the eleventh grade (Id. at 82). Serrano said he subsequently obtained a GED and attended trade school and received a certificate of completion, studying "heating, plumbing, and electrical" (Id.). Before Serrano's attorney made his closing statement, the ALJ noted for the record that Serrano was wearing a back brace underneath his shirt (Id. at 89).

**2. Testimony of Dr. Martin Fechner, M.D.**

Dr. Fechner stressed that he was not qualified to render an expert opinion on Serrano's psychiatric disabilities (Id. at 67). Dr. Fechner based the following findings on a report done by Dr. Arias (Id.). He stated that Serrano had a small herniated disc in his back, "which means the disc is sticking out from where it should be into the spinal canal to some degree" (Id. at 68). According to Dr. Fechner, the MRI Serrano underwent showed no sign of spinal stenosis, a condition where there is an impediment to the canal through which nerves receive their stimuli (Id.). Dr. Fechner did believe that Serrano probably had some compression of those nerves that explained the pain he was in (Id.). Dr. Fechner said the epidural shots Serrano received would be proper treatment for the pain (Id. at 69). Dr. Fechner than turned to a physical exam of Serrano done by a consultative orthopedist, Dr. Freedmen and, upon review, concluded that "[b]asically, it was a negative exam" (Id.). He stated that Serrano's strength and sensory faculties and tendon reflexes were normal (Id.).

The ALJ then referred Dr. Fechner to a RFC report completed by Dr. Freedmen (Id at 70.). Dr. Fechner concluded that although he would give Serrano a lower RFC, Dr. Freedmen's clinical findings were consistent with the RFC that Dr. Freedmen gave Serrano (Id.). Dr.

5

Fechner believed that Serrano could sit for six to eight hours a day, as long as every forty-five minutes to an hour he could stretch for a minute or two (Id.). In Dr. Fechner's opinion Serrano could walk about three hours in an eight hour workday (Id.).

The ALJ then asked Dr. Fechner to review an assessment by Dr. Pirone (Id. at 73). Dr. Fechner stated that the assessment taken as a whole was similar to Dr. Fechner's overall conclusions, but that he would give Serrano a more restrictive RFC than Dr. Pirone did (Id.).

Serrano's attorney then referred Dr. Fechner to a physical exam of Serrano done by Dr. McMahon on September 5, 2007 (Id.). Serrano had not been using a cane regularly at that point (Id. at 74). Dr. Fechner stated that this exam was slightly different than the others he reviewed (Id.). Dr. McMahon reported that a slight limp and a straight leg raising test - which had tested negative in Dr. Freedmen's exam - was "positive at 30 degrees on the left and 45 degrees on the right" (Id. at 73). Dr. Fechner said that thirty to forty-five degrees was not a severe problem, but was by no means normal (Id. at 73). Dr. Fechner believed that while the degree of pain from Serrano's ailments was subjective based on the individual, "he has a condition that could cause pain, certainly" (Id. at 76). Dr. Fechner said that the epidural shots administered to Serrano are usually given by pain management specialists (Id. at 78). Dr. Fechner stated that a patient's MRI results need to show something that is consistent with significant pain, and then usually "the patient has to complain bitterly" before the shots are administered (Id.). Dr. Fechner said that Dr. McMahon did make some findings that Dr. Freedmen did not, and that Dr. McMahon's findings were part of the reason Dr. Fechner gave Serrano a more restrictive RFC than Dr. Freedmen did (Id. at 80).

### 3. Testimony of Vocational Expert Patricia Sosuna

Upon questioning by the ALJ, the VE testified about several hypothetical circumstances

6

which would either allow Serrano to work at certain jobs or prohibit him from doing so (Id. at 83-86). The VE stated that someone with the same characteristics as Serrano could perform in light assembly and packing jobs (Id. at 85). She gave the example position of "final assembler," and stated that there are approximately 1,000 local positions available and approximately 135,000 national positions available (Id.).

Upon questioning by Serrano's attorney, the VE said that all the jobs she described in her testimony were production oriented positions, with the possible exception of the two cashier jobs (Id. at 87.). The VE acknowledged that someone working in those positions would typically work fifty to fifty-five minutes out of every hour (Id.). The VE said that it would be necessary for a person working those jobs to maintain a certain speed or pace (Id.). Serrano's attorney then asked the VE to acknowledge that anything that would interfere with an individual's ability to concentrate and pay attention fifty to fifty-five minutes every hour would have a negative effect on the individual's ability to do any of the jobs the VE discussed (Id. at 88.). At that point, the ALJ interjected and said "I think she already testified to the fact that if you can't maintain - if this hypothetical individual couldn't maintain a production pace, there would be no jobs available" (Id.). The VE stated that her estimates were based on extrapolations from her review of the labor market and her experience as an expert in the field (Id.). She also noted that there were over 3 million cashier's jobs in the United States (Id. at 89). The VE also said that there were placement services available for cashiers (Id.).

4. **Medical Reports and Other Material Facts.**

The ALJ looked at several medical reports of Serrano that contained different conclusions. Dr. Pirone gave Serrano a primary diagnosis of Degenerative dis disease and a secondary diagnosis of Spondylosis lubarsacral spine (Id. at 96.). Dr. Briski, however, said that

7

the lack of medical evidence in Serrano's file lead him to offer no diagnosis of a disability at all (Id. at 98). The Social Security Administration ("SSA") considered Dr. Arias' report in its initial denial of Serrano's claim, even before Dr. Fechner offered his testimony at the hearing before the ALJ (Id. at 100.). Based solely on Dr. Arias' report and a consultative exam by another doctor, the SSA determined that Serrano's "condition does not keep you from working." (Id.).

As of May 15, 2008, Serrano had not submitted to a medical examination by the SSA which would have been performed at the SSA's expense (Id. at 108.) The SSA stated that this failure left them with insufficient information with which to evaluate Serrano's claim (Id.). Although Serrano complained of significant depression at the hearing, the record does not indicate that he was treated with any medication (Id. at 133.). Further, Serrano's medical treatment during the time that the SSA was in the process of evaluating his claim did not include a hospitalization for any purpose (Id. at 183). In a report filed with the SSA, Serrano indicated that Dr. Arias, had given him Ibuprofen, Motrin, and Tramadol for pain relief. On April 2, 2007, Dr. Arias also sent Serrano for an MRI, CT scan, and X-ray on his lower back (Id. at 237). Serrano indicated he had not taken advantage of the "Ticket program" or any other program providing vocational rehabilitation, employment or other support services that could assist him in finding work (Id. at 238).

A disability report was completed by the SSA after Serrano was interviewed at one of the SSA's field offices on May 15, 2007 (Id. at 240). The report indicated that Serrano had not exhibited any trouble hearing, reading, breathing, or understanding the questions (Id. at 242). Serrano was coherent and speaking well, concentrating and answering questions normally, and standing and walking normally (Id. at 242). Serrano did appear to have some difficulty seeing, but wore eye glasses throughout the interview to aid him (Id.). He had no difficulty using his

hands and writing (Id.). Serrano was well groomed and attentive (Id.). Serrano did not bring any medical evidence to the interview.

In an appeal from the initial Disability Report interview discussed immediately above, Serrano indicated that he saw Dr. Kaul on October 6, 2007 (Id. at 254). Serrano complained of back pain and was examined and was given epidurals and medications. Serrano indicated that at the time, he was taking four medications: Celebrex for stiffness; Ibuprofen for pain and to prevent swelling, and Percocet and Tramadol for pain (Id. at 255). The first three medications were prescribed or recommended by Dr. Kaul (Id). The Tramadol was prescribed by Dr. Arias. Id. Serrano also indicated that on May 7, 2007, he had further X-rays of his back taken, as well as an MRI and CT scan (Id. at 256).

In a function report received by the SSA on November 5, 2007, Serrano stated that while his daily activities were restricted, difficult, and often painful, he did read the newspaper on a typical day (Id.). Serrano indicated feelings of sadness and a routine totally devoid of a social life, but did say that his troubles helped him to deal with stress: "Very well. I've learned that I have to cope with things" (Id. at 265). In a subsequent Disability Report to the SSA, Serrano indicated that he had begun to attend physical therapy in January 2008 and by then was only taking Ibuprofen for his pain (Id. at 269-70).

In December 2009, a report by SSA employee Theandra Jenkins indicated that Serrano had still not appeared for an SSA physical or psychological exam (Id. at 276). Jenkins stated that she had tried contacting Serrano several times, but to no avail - his telephone line she tried had been disconnected and mail sent out to him had been returned to her office, indicating that Serrano's mailing address was different from the one the SSA had on record (Id.). She stated that Serrano's whereabouts were entirely unknown at that time (Id.).

Mr. Serrano finally underwent a psychological evaluation by Dr. Ernesto Perdomo, a Licensed Psychologist, on April 2, 2010, more than two months after his first appearance before the ALJ on January 25th (Id. at 403). Dr. Perdomo noted that Serrano had no history of psychiatric treatment (Id. at 404). Dr. Perdomo diagnosed Serrano with major recurrent depression incident to his chronic back pain but also stated that Serrano's long term memory was fair, his intelligence was within average range, and his vocabulary was adequate (Id. at 405-06). Dr. Perdomo also stated that Serrano's concentration was fair or slightly impaired and that he followed the interview well (Id. at 405).

## II.  STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla . . . but may be less than a preponderance." Woody v. Sec'y of Health & Human Servs, 859 F.2d 1156, 1159 (3d Cir. 1988). It "does not mean a large or considerable amount of evidence, but rather such relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (citation omitted). Not all evidence is considered "substantial." For instance,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g. that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). As such, it does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner. Monsour Med. Ctr. V. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). "The district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)). A Court must nevertheless "review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)).

To properly review the findings of the ALJ, the court needs access to the ALJ's reasoning. Accordingly,

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)). A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)). If the ALJ fails to properly indicate why evidence was rejected, the court is not permitted to determine whether the evidence

was discredited or simply ignored. See Burnett v. Comm'r of Soc. Sec, 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

## III. APPLICABLE LAW

### A. THE FIVE-STEP PROCESS

A claimant's eligibility for benefits is governed by 42 U.S.C. §1382. Pursuant to the Act, a claimant is eligible for benefits if he meets the income and resource limitations of 42 U.S.C. §§ 1382a and 1382b, and demonstrates that he is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). A person is disabled only if his physical or mental impairment(s) are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of work which exists in the national economy." 42 U.S.C. §1382c(a)(3)(B).

To determine whether the claimant is disabled, the Commissioner performs a five-step sequential evaluation. 20 C.F.R. §416.920. The claimant bears the burden of establishing the first two requirements, namely that he (1) has not engaged in "substantial gainful activity" and (2) is afflicted with a "severe impairment" or "combination of impairments." 20 C.F.R. §404.1520(a)-(c). If a claimant fails to demonstrate either of these two requirements, DIBs are denied and the inquiry ends. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). If the claimant successfully proves the first two requirements, the inquiry proceeds to step three which requires the claimant to demonstrate that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Part 404 Appendix 1 (the "Listings"). If the claimant

demonstrates that his impairment meets or equals one of the listed impairments, he is presumed to be disabled and therefore, automatically entitled to DIBs. Id. If he cannot make the required demonstration, further examination is required.

The fourth step of the analysis asks whether the claimant's residual functional capacity ("RFC") permits him to resume his previous employment. 20 C.F.R. §416.920(e). If a claimant is able to return to his previous employment, he is not disabled within the meaning of the Act and is not entitled to DIBs. Id. If the claimant is unable to return to his previous employment, the analysis proceeds to step five. At this step, the burden shifts to the Commissioner to demonstrate that the claimant can perform a job that exists in the national economy based on the claimant's RFC, age, education, and past work experience. 20 C.F.R. §416.920(g). If the Commissioner cannot satisfy this burden, the claimant is entitled to DIBs. Yuckert, 482 U.S. at 146 n.5.

### B. THE REQUIREMENT OF OBJECTIVE EVIDENCE

Under the Act, disability must be established by objective medical evidence. "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section." Id. Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

Id.; see 42 U.S.C. § 1382c(a)(3)(A). Credibility is a significant factor. When examining the record: "The adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities." SSR 96-7p, 1996 WL 374186 (July 2, 1996). To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record. Id. The requirement for a finding of credibility is found in 20 C.F.R. § 416.929(c)(4). A claimant's symptoms, then, may be discredited "unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 416.929(b); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

## IV. **DISCUSSION**

Serrano claims that the ALJ erred in steps three and five of the five-step analysis. These steps will be addressed in turn.

### A. STEP THREE

Serrano challenges the ALJ's conclusion made at step three in the sequential evaluation that the combination of his impairments were not equal to or greater than one of those included in the Listings. Specifically, the ALJ concluded that Serrano's impairments did not meet the criteria of Listing 1.04. Serrano insists that the ALJ's opinion is conclusory and contains no analysis as to what he is missing that prevents him from establishing medical equivalence with the Listings (Pl.'s Br. at 18.). Further, Serrano asserts that the ALJ did not do a "combine and compare" analysis, which requires the ALJ to consider the combined effect of a claimant's impairments if the claimant has more than one. See Knepp v. Apfel, 204 F.3d 78, 85 (3rd Cir. 2000).

The Commissioner, on the other hand, argues that this Court must uphold the ALJ's

finding that Serrano's impairments did not satisfy Listing 1.04 because the ALJ pointed to substantial evidence in the record to support that conclusion (Def.'s Br. at 5). The Commissioner points out that the ALJ noted that consultative orthopedic examiners, Dr. Friedman and Dr. Mahan, collectively indicated full range of motion, no signs of atrophy or weakness, normal sensation and reflexes, and independent daily activities (Tr. 19, 293, 350-51). The Commissioner concedes that the Serrano's MRI, as interpreted by Dr. Fechner, did indicate a herniated disc, disc bulge, stenosis, and nerve compression, but argues that Serrano lacked other abnormalities required by Listing 1.04 to support a finding of disability. See Sullivan v Zebley, 493 U.S. 521, 530 (1990) (stating that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify"). The Commissioner also claims that the ALJ did explicitly express that he used a combination and comparison analysis when he stated that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" (Tr. at 17). Further, the Commissioner points out that the ALJ referenced Serrano's back and mental impairments throughout his decision and noted Dr. Arias's and Dr. Perdomo's observations of the intertwinement between each condition. (Id.) The Commissioner argues that all of this shows that the ALJ relied on substantial evidence when making his findings, and thus the record does not support Serrano's contention that the ALJ did not provide a sufficient analysis (Id.). This Court finds the Commissioner's arguments to be persuasive.

Further, the ALJ's opinion explicitly concludes that Serrano was not credible and was prone to exaggeration, both in general and with respect to his emotional difficulties in particular (Id. at 20). The ALJ also stated that Serrano's exaggerations likely prejudiced the psychological evaluation performed on him by Dr. Perdomo (Id.). The Court notes that the ALJ's finding of

15

credibility is supported by substantial evidence in the record: Serrano had no history of therapy for mental illness of any kind, no history of medications treating such illness, and no other objective indications of mental illness, save his own testimony (Id. at 403). The fact that Serrano's psychological evaluation was well over two months after his hearing before the ALJ further supports the ALJ's doubt surrounding Serrano's assertions. Indeed, the ALJ had no objective evidence of Serrano's claimed psychological impairments at the time of the hearing. Without such evidence, the ALJ, sitting as the finder of fact, was free to disregard the claimant's testimony as incredible. 20 C.F.R. § 416.929(b); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

Additionally, Serrano's failure to report for physical examinations, answer phone calls, or respond to letters at several points during the SSA's adjudication of his disability claim lends further support to the ALJ's finding. Finally, Serrano's documented physical progress over time assists the ALJ's finding. By his own admissions, by the time of the hearing, Serrano ceased taking several prescribed medications for back pain and began attending physical therapy (Tr. at 269-70). Thus, Court concludes that the ALJ's reasoning at step three of the sequential process was supported by substantial evidence.

**B. STEP FIVE**

Like the ALJ's conclusions at step three, this Court finds his conclusions as to sequential step five to be supported by substantial evidence. The ALJ's determinations as to Serrano's physical impairments are aptly supported by Dr. Fechner's reports and testimony (Id. at 21, 322, 327, 378, 383). Further, the VE clearly pointed out that someone with Serrano's vocational factors could perform light assembly and packaging jobs, such as a final assembler position, and that approximately 1,000 of these positions exist locally and approximately 135,000 of these

positions exist nationally. The ALJ did not err in relying on the testimony of the VE, as this is expressly permitted. See 20 C.F.R. § 404.1566(e). Further, the VE's testimony in this case was thorough and provided enough detail for the ALJ to consider in making his determination. As such, this Court finds no occasion to hold that the ALJ's decision at step five was not supported by substantial evidence.

## V.     CONCLUSION

For the foregoing reasons, the final decision entered by the ALJ is **affirmed**. An appropriate order follows this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date:       September 30, 2013
Original:   Clerk's Office
cc:         Hon. Joseph A. Dickson, U.S.M.J.
            All Counsel of Record
            File